UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | EDCV 21-1243 JGB (KKx) | Date | July 30, 2021 |
| Title | *America's Frontline Doctors, et al. v. Kim A. Wilcox, et al.* | | |

Present: The Honorable   JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

Attorney(s) Present for Plaintiff(s):      Attorney(s) Present for Defendant(s):

None Present                None Present

**Proceedings:**   **Order DENYING Plaintiffs' Ex Parte Application for Temporary Restraining Order (Dkt. No. 8) (IN CHAMBERS)**

Before the Court is an ex parte application for temporary restraining order and order to show cause why a preliminary injunction should not issue filed by Plaintiffs America's Frontline Doctors, Carly Powell, and Deborah Choi. ("Application," Dkt. No. 8.) After considering the papers filed in support of and in opposition to the Application, the Court DENIES the Application.

## I. BACKGROUND

On July 26, 2021, Plaintiffs America's Frontline Doctors ("AFD"), Carly Powell, and Deborah Choi filed a complaint against Defendants Kim A. Wilcox, Chancellor of the University of California Riverside ("Wilcox" or "UC Riverside Chancellor"); Howard Gillman, Chancellor of the University of California Irvine ("Gillman" or "UC Irvine Chancellor"); The Regents of the University of California ("Regents"); and Michael V. Drake, President of the University of California. ("Complaint," Dkt. No. 1.)

The Complaint alleges five causes of action arising from the University of California's COVID-19 Vaccination Program: (1) declaratory relief for violation of Fourteenth Amendment right to bodily integrity; (2) injunctive relief for violation of Fourteenth Amendment right to bodily integrity; (3) injunctive relief for violation of Fourteenth Amendment right to freedom from state created danger; (4) violation of Unruh Act for discrimination based on medical condition and genetic status; and (5) violation of Cal. Govt. Code § 11135 for discrimination based on medical condition and genetic status. (See Compl.)

Plaintiffs filed the Application on July 27, 2021. In support of the Application, Plaintiffs filed the following declarations:

- Declaration of Angelina Farella, MD ("Farella Declaration," Dkt. No. 8 at 36);
- Declaration of Lee Merritt, MD ("Merritt Declaration," Dkt. No. 8 at 45);
- Declaration of Mike Yeadon, PhD ("Yeadon Declaration," Dkt. No. 8 at 56);
- Declaration of Peter A. McCullough, MD ("McCullough Declaration," Dkt. No. 8 at 95);
- Declaration of Simone Gold, MD, JD ("Gold Declaration," Dkt. No. 8 at 304);
- Declaration of Richard Urso, MD ("Urso Declaration," Dkt. No. 8 at 308);
- Declaration of Carly Powell ("Powell Declaration," Dkt. No. 8 at 318); and
- Declaration of Deborah Choi ("Choi Declaration," Dkt. No. 8 at 321).

Defendants filed an opposition on July 28, 2021. ("Opposition," Dkt. No. 9.) In support of the Opposition, Defendants filed the following declarations:

- Declaration of Bernadette M. Boden-Albala, MPH ("Boden-Albala Declaration," Dkt. No. 10);
- Declaration of David Lo, MD, PhD ("Lo Declaration," Dkt. No. 11);
- Declaration of Susan S. Huang, MD, MPH ("Huang Declaration," Dkt. No. 12); and
- Declaration of Emily T. Kuwahara ("Kuwahara Declaration," Dkt. No. 13).

## II. FACTS

### A. The Policy

On July 15, 2021, the University of California ("University" or "UC") adopted the SARS-CoV-2 (COVID-19) Vaccination Program ("Policy") "to facilitate the protection of the health and safety of the University community" in the face of the COVID-19 pandemic. (Kuwahara Decl., Ex. 2.) The Policy requires personnel, students, and trainees ("Covered Individuals")[1] to provide proof of full vaccination or submit a request for exception or deferral as a condition of physical presence at any campus, medical center, or facility operated by the University. (Id. at 5.) Covered Individuals must meet this requirement by two weeks before the first day of instruction. (Id.)

---

[1] Specifically, Covered Individuals include "anyone designated as Personnel, Students, or Trainees … who physically access a University Facility or Program in connection with their employment, appointment, or education/training." (Id. at 2.)

The Policy provides for limited exceptions based on medical exemption, disability, or religious objections. (Id. at 3.) Deferrals are only available based on pregnancy, for the duration of the pregnancy, and until the individual returns to work or instruction. (Id. at 2.)

Individuals who were recently diagnosed with COVID-19 and/or had an antibody test that shows they have natural immunity may be eligible for a temporary medical exemption:

> You may be eligible for a temporary Medical Exemption (and, therefore, a temporary Exception), for up to 90 days after your diagnosis and certain treatments. According to the US Food and Drug Administration, however, "a positive result from an antibody test does not mean you have a specific amount of immunity or protection from SARS-CoV-2 infection … Currently authorized SARS-CoV-2 antibody tests are not validated to evaluate specific immunity or protection from SARS-CoV-2 infection." For this reason, individuals who have been diagnosed with COVID-19 or had an antibody test are not permanently exempt from vaccination.

(Id. at 11.)

The Policy provides that "[a]lternative remote instructional programming is not expected to be available in most cases and the availability of alternative remote work arrangements will depend on systemwide guidance and any local policies or procedures, as well as the nature of the work to be performed." (Id. at 5.) Covered Individuals who do not comply with the Policy by presenting proof of vaccination or requesting an applicable exception or deferral "will be barred from Physical Presence at University Facilities and Programs, and may experience consequences as a result of non-Participation, up to and including dismissal from educational programs or employment." (Id. at 12-13.)

In a letter accompanying the Policy, University President Michael V. Drake, MD, explained that the Policy "is the product of consultation with UC infectious disease experts and ongoing review of evidence from medical studies concerning the dangerousness of COVID-19 and emerging variants of concern, as well as the safety and effectiveness of the vaccines for preventing infection, hospitalizations, and deaths from COVID-19, and for reducing the spread of this deadly disease." (Kuwahara Decl., Ex. 1.) Drake further asserts that the Policy "was arrived at after reviewing the safety and efficacy of the three vaccines approved by the Food and Drug Administration (FDA) for emergency use, and considering the severe risks presented by a virus that has killed more than 600,000 people in the United States alone, as well as the rise of more transmissible and more virulent variants." (Id.)

### B. Plaintiffs' Position

Plaintiffs challenge the Policy as it applies to individuals who contracted COVID-19 and recovered. Plaintiff Deborah Choi is a second-year law student at UC Irvine, who is also employed by the school as a research assistant. (Choi Decl. ¶ 2.) Choi contracted COVID-19 in November 2020 and recovered. (Id. ¶ 5.) Plaintiff Carly Powell is a senior at UC Riverside.

(Powell Decl. ¶ 2.)  Powell contracted COVID-19 in December 2020 and recovered.  (Id. ¶ 3.)  Individual Plaintiffs assert that they have not provided their "informed consent" to COVID-19 vaccination.  (Choi Decl. ¶ 3; Powell Decl. ¶ 6.)  They argue that the Policy does not respect their right to work with their doctors to assess their natural immunity to COVID-19 beyond 90 days.  (Choi Decl. ¶ 3; Powell Decl. ¶ 6.)  AFD asserts that its member physicians provide care to UC students directly impacted by the Policy, which in turn impairs the physician-patient relationships.  (Compl. ¶ 6; Gold Decl. ¶ a.)  Plaintiffs seek a temporary restraining order enjoining Defendants from enforcing the Policy rejecting prescreening of natural immunity.  (See Appl.)

### III.   LEGAL STANDARD

A temporary restraining order ("TRO") preserves the status quo and prevents irreparable harm until a hearing may be held on the propriety of a preliminary injunction.  See Reno Air Racing Ass'n, Inc. v. McCord, 452 F.3d 1126, 1131 (9th Cir. 2006).  The standard for issuing a TRO is identical to the standard for issuing a preliminary injunction.  Lockhead Missile & Space Co. v. Hughes Aircraft Co., 887 F. Supp. 1320, 1323 (N.D. Cal. 1995).

"A preliminary injunction is an extraordinary and drastic remedy; it is never awarded as of right."  Munaf v. Geren, 553 U.S. 674, 689 (2008) (citations omitted).  An injunction is binding only on parties to the action, their officers, agents, servants, employees, and attorneys and those "in active concert or participation" with them.  Fed. R. Civ. P. 65(d)(2).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).  In the Ninth Circuit, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."  Alliance for Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011) (internal quotations omitted).

When seeking a temporary restraining order through an ex parte application, a plaintiff must further show that he is without fault in creating the crisis necessitating the bypass of regular motion procedures.  See Mission Power Eng'g Co. v. Cont'l Gas Co., 883 F. Supp. 488, 492–93 (C.D. Cal. 1995).  The propriety of a temporary restraining order, in particular, hinges on a significant threat of irreparable injury, Simula, Inc. Autoliv, Inc., 175 F.3d 716, 725 (9th Cir. 1999), that must be imminent in nature, Caribbean Marine Serv. Co. v. Baldridge, 844 F.2d 668, 674 (9th Cir. 1988).  The Ninth Circuit has cautioned that there are very few circumstances justifying the issuance of an ex parte temporary restraining order.  Reno Air Racing Assoc., Inc., 452 F.3d at 1131.

//
//

## IV. DISCUSSION

Plaintiffs request that the Court enjoin enforcement of the Policy "unnecessarily rushing Covid-19 vaccination upon already immune students without their informed consent and without the opportunity of their doctors to protect them from risk of physical injury and death." (Appl. at 2.) To succeed, Plaintiffs must show that (1) they are likely to succeed on the merits of their claim; (2) they are likely to suffer irreparable harm in the absence of emergency relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). As detailed below, Plaintiffs do not meet their burden as to any factor.

### A. Likelihood of Success

Plaintiffs claim that the Policy infringes on (1) their Fourteenth Amendment right to bodily integrity, (2) their Fourteenth Amendment right to be free from state created dangers, and (3) the prohibition against discrimination on the basis of medical condition and genetic status under the California Unruh Act and Cal. Govt. Code § 11135.

#### 1. Fourteenth Amendment – Violation of Bodily Integrity

##### a. Standard of Constitutional Scrutiny

The Supreme Court recognizes a "constitutionally protected liberty interest in refusing unwanted medical treatment[.]" Cruzan v. Dir., Missouri Dep't of Health, 497 U.S. 261, 278 (1990). Plaintiffs argue that the Policy's restrictions of that right to free and informed consent is subject to strict scrutiny. (Appl. at 6.) Not so. Where an alleged government deprivation infringes on a fundamental right, courts apply strict scrutiny, the most rigorous form of constitutional scrutiny of the government action. Nunez v. City of L.A., 147 F.3d 867, 871 (9th Cir. 1998); Washington v. Glucksberg, 521 U.S. 702, 721 (1997). Under that standard, the Fourteenth Amendment "forbids the government to infringe … fundamental liberty interests … unless the infringement is narrowly tailored to serve a compelling state interest." Glucksberg, 521 U.S. at 721. However, where the infringed liberties are neither fundamental nor based on suspect classification, rational basis review applies. Sylvia Landfield Tr. v. City of L.A., 729 F.3d 1189, 1191 (9th Cir. 2013); Glucksberg, 521 U.S. at 728. Under rational basis review, "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 440 (1985).

None of Plaintiffs' authorities support their proposition that the right to informed consent is a fundamental right under the Constitution. Rather, Plaintiffs appear to rely on Roman Catholic Diocese of Brooklyn v. Cuomo to support the application of strict scrutiny. 141 S. Ct. 63, 67 (2020). (Appl. at 7-8.) But Cuomo concerned capacity restrictions on religious institutions, which plaintiffs argued were treated less favorably than "essential" businesses. The Court applied strict scrutiny because the law at issue targeted religious practice, and "the

challenged restrictions [we]re not 'neutral' and of 'general applicability[.]'" Cuomo, 141 S. Ct. at 67 (citing Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 546 (1993)). "In addressing the constitutional protection for free exercise of religion," courts apply strict scrutiny unless the challenged law is neutral and of general applicability. Church of Lukumi, 508 U.S. at 531. However, a law "that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." Church of Lukumi, 508 U.S. at 531.

Strict scrutiny is not applicable here. First, Plaintiffs make no showing that the Policy targets the free exercise of religion. Even if that were the case, as Defendants point out, the Policy is in fact neutral and of general applicability. More generally, Plaintiffs make no showing that the interest at issue here (bodily autonomy or informed consent) is fundamental under the Constitution so as to require greater scrutiny. Thus, the Court applies rational basis. See Klaassen, 2021 WL 3073926, at *21 ("Government action that infringes on the liberty interest here … is subject to rational basis review."). This is consistent with the longstanding application of rational basis review to assess mandatory vaccination measures. Id. at *24 (listing cases).

### b. Application

The Policy is "rationally related to a legitimate state interest." City of Cleburne, 473 U.S. at 440. The Supreme Court has recognized that "[s]temming the spread of COVID-19 is unquestionably a compelling interest." Cuomo, 141 S. Ct. at 67. At issue is whether the Policy is rationally related to this compelling state interest. The Policy easily meets this test.

Over a century ago, the Supreme Court held that "a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." Jacobson v. Commonwealth of Massachusetts, 197 U.S. 11, 27 (1905). California is facing a surge of COVID-19 cases, spurred by the highly contagious Delta variant. (Kuwahara Decl., Exs. 3-7, 12 (recent news report detailing sharp increase in COVID-19 cases and the prevalence of the Delta variant); Lo Decl. ¶ 7.) Extensive data supports vaccination as an effective strategy for preventing severe disease, hospitalization, and death from COVID-19. (Kuwahara Decl., Ex. 8 at 34-36; Huang Decl. ¶¶ 6-7.) The vaccines currently available in the United States were authorized for emergency use after extensive randomized controlled trials, and the U.S. Centers for Disease Control and Prevention ("CDC") and U.S. Food and Drug Administration ("FDA") continue to conduct post-authorization safety and monitoring. (Id.)

As stated in the Policy Summary, the Policy's purpose is "to facilitate protection of the health and safety of the University community." (Kuwahara Decl., Ex. 2 at 2.) It is "the product of consultation with UC infectious disease experts and ongoing review of evidence from medical studies concerning the dangerousness of COVID-19 and emerging variants of concern, as well as the safety and effectiveness of the vaccines for preventing infection, hospitalizations, and deaths from COVID-19, and for reducing the spread of this deadly disease." (Id., Ex. 1 at 1.) Susan Huang, MD, MPH, attests that the UC Health infection prevention leadership group was actively consulted regarding the Policy. (Huang Decl. ¶ 5 (endorsing the Policy).) Facing similar

circumstances, several universities resuming on-campus operations have adopted similar policies. (Kuwahara Decl., Exs. 13-21.)

As it pertains to individuals who previously contracted COVID-19, Defendants point to evidence that "ascertainment of prior infection can be unreliable or impractical in some cases, and the duration of protection of prior infection is unknown." (Id., Ex. 22, at 9-10.[2]) Data shows that "[v]accination appears to further boost antibody levels in those with past infection and might improve the durability and breadth of protection." (Id.) While this report recognizes that "[i]ndividuals with a history of SARS-CoV-2 may be more likely to experience local and systemic adverse effects (eg, fevers, chills, myalgias, fatigue) after a first vaccine dose[,] … [t]his is not a contraindication or precaution to a second dose…." (Id.)

In fact, in its Interim Clinical Considerations for Use of COVID-19 Vaccines Currently Authorized in the United States,[3] the CDC has indicated:

> Data from clinical trials indicate that the currently authorized COVID-19 vaccines can be given safely to people with evidence of a prior SARS-CoV-2 infection. Viral testing to assess for acute SARS-CoV-2 infection or serologic testing to assess for prior infection is not recommended for the purposes of vaccine decision-making…. While there is no recommended minimum interval between infection and vaccination, current evidence suggests that the risk of SARS-CoV-2 reinfection is low in the months after initial infection but may increase with time due to waning immunity.

Indeed, a recent study suggests that the immunity of individuals who previously had COVID-19 may not be as effective against the surging Delta variant. (Kuwahara Decl., Ex. 24.) Thus, the CDC recommends vaccination for individuals who have already had COVID-19 and recovered. (Id., Ex. 23.)

Plaintiffs, of course, dispute the above evidence, arguing that "emerging data establishes that vaccinating the Covid-19 Recovered causes an immediately higher death rate worldwide for no benefit[.]" (Appl. at 10 (citing Compl. ¶ 27).) But Plaintiffs' arguments amount to "disputes over the most reliable science," and the Court will not intervene "as long as [Defendants'] process is rational in trying to achieve public health." Klaassen, 2021 WL 3073926, at *38 (citing Phillips v. City of New York, 775 F.3d 538, 542 (2d Cir. 2015) ("[P]laintiffs argue that a growing body of scientific evidence demonstrates that vaccines cause more harm to society than good, but as Jacobson made clear, that is a determination for the [policymaker], not the individual

---

[2] Kathryn M. Edwards, et al., "COVID-19: Vaccines to prevent SARS-CoV-2 infection," UpToDate (updated July 26, 2021), https://www.uptodate.com/contents/covid-19-vaccines-to-prevent-sars-cov-2-infection.

[3] See "People with prior or current SARS-CoV-2 infection," CDC (updated July 16, 2021) https://www.cdc.gov/vaccines/covid-19/clinical-considerations/covid-19-vaccines-us.html.

objectors.")). The Court finds that there is clearly a rational basis for Defendants to institute the Policy requiring vaccination, including for individuals who previously had COVID-19. Plaintiffs' first claim is unlikely to succeed on the merits.

### 2. Fourteenth Amendment – State Created Danger

Plaintiffs next argue that Defendants have shown "deliberate indifference to the known and obvious danger of vaccine injury," which creates and exposes Plaintiffs to health dangers that they would not otherwise face, in contravention of the Fourteenth Amendment. (Appl. at 15-16.) The state-created danger exception applies only where "there is affirmative conduct on the part of the state in placing the plaintiff in danger," and "the state acts with deliberate indifference to a known or obvious danger." Patel v. Kent Sch. Dist., 648 F.3d 965, 974 (9th Cir. 2011) (internal quotation marks omitted). Plaintiffs fail to make this showing.

Deliberate indifference is "a stringent standard of fault, requiring proof that [the state] actor disregarded a known or obvious consequence of his action." Id. The state actor must "recognize an unreasonable risk and actually intend to expose the plaintiff to such risks without regard to the consequences to the plaintiff." Id. at 975. Here, the record supports the opposite conclusion.

The Policy provides that it was adopted to protect the health and safety of the community. (Kuwahara Decl., Ex. 2 at 2.) It was developed in active consultation with infectious disease experts, including the UC Health infection prevention leadership. (Huang Decl. ¶ 5; see also Kuwahara Decl. Ex. 1 (detailing that the Policy was developed in consultation with UC infectious disease experts and after a review of evidence from medical studies).) These experts endorse the Policy, including its application to individuals who previously contracted COVID-19 and recovered, as a crucial measure to protect the University community (including those individuals). (See Boden-Albala Decl.; Lo Decl.; Huang Decl.)

The Policy explicitly accounts for recent COVID-19 diagnoses by providing a temporary medical exemption. (Kuwahara Decl., Ex. 2.) While Plaintiffs point to a danger of "vaccine injury" for individuals with natural immunity, as noted above, the CDC recommends vaccination for those who have contracted and recovered from COVID-19, citing data from clinical trials. (Id., Ex. 23 (CDC, "Frequently Asked Questions about COVID-19 Vaccination"); n.3 infra). The Policy thus stands in harmony with recommendations by the CDC and FDA, which "strongly believes that the known and potential benefits of COVID-19 vaccination greatly outweigh the known and potential risks of COVID-19." (Id., Ex. 28 (FDA, COVID-19 Vaccine Safety Surveillance, July 12, 2021); Ex. 27 (CDC, Safety of COVID-19 Vaccines) (noting that "serious safety problems are rare").) This evidence supports Defendants' conclusion that requiring vaccination is far from an "unreasonable risk" or a "known and obvious danger." Plaintiffs are unlikely to prevail on the merits of their second claim.

//
//

### 3. State Law Claims

Finally, Plaintiffs assert state law claims under the California Unruh Act and Cal. Govt. Code § 11135. However, as Defendants point out, these claims are barred by the Eleventh Amendment. (Opp'n at 18.) The Eleventh Amendment bars suits for damages or injunctive relief against a state, an arm of the state, its instrumentalities, or its agencies. Durning v. Citibank, N.A., 950 F.2d 1419, 1422-23 (9th Cir. 1991). Plaintiffs assert state law claims against The Regents of the University of California, as well as UC President, the UC Riverside Chancellor, and the UC Irvine Chancellor, all in their official capacities. However, the Regents of the University of California "are an arm of the state entitled to Eleventh Amendment immunity." Feied v. The Regents of the Univ. of California, 188 F. App'x 559, 561 (9th Cir. 2006). The Eleventh Amendment also prohibits actions against state officials in their official capacities. Stivers v. Pierce, 71 F.3d 732, 749 (9th Cir. 1995)

A citizen may sue a state in federal court if the state waives its immunity and consents to suit. Welch v. Tex. Dep't of Highways & Pub. Transp., 483 U.S. 468, 473 (1987). "A State's consent to suit must be 'unequivocally expressed' in the text of the relevant statute." Sossamon, 563 U.S. at 284. Plaintiffs point to no such statutory waiver. Absent an express and unequivocal waiver of California's sovereign immunity, Plaintiffs' state law claims are unlikely to succeed.

## B. Irreparable Harm

Next, Plaintiffs must establish that there is a likelihood of irreparable injury absent the Court's grant of the TRO. Alliance for Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011). As Plaintiffs point out, "[i]t is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" Melendres v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976)). But, for the reasons discussed above, Plaintiffs' constitutional claims are unlikely to succeed. Plaintiffs' claims that the Policy violates their constitutional rights are thus insufficient to establish irreparable harm.

Plaintiffs further suggest that AFD will suffer irreparable harm because member physicians provide care to UC students impacted by the vaccine mandate, which would irreparably impair their physician-patient relationships. (Appl. at 20 (citing Compl. ¶¶ 6, 11).) In turn, Individual Plaintiffs argue they face "risks of life and limb … if they are forced to unnecessarily vaccinate[.]" (Appl. at 20.) They add that the vaccine mandate has put them under duress, impaired their ability to exercise informed consent or refusal of the vaccine with physicians of their choice, and imperiled their academic status and livelihood as students. (See Choi Decl.; Powell Decl.) The Court is not persuaded.

First, as Defendants point out, AFD makes no showing that its members are subject to the Policy, or have any role in executing the Policy (such as being required to provide the vaccines to their patients). AFD shows little more than a tenuous connection to the Policy - that some physicians may provide care to UC students who disagree with the Policy. But that is not enough to show harm, much less irreparable harm, to AFD.

Second, Plaintiffs fail to establish that Individual Plaintiffs will be irreparably harmed. Plaintiffs allude to a series of harms resulting from being "forced to unnecessarily vaccinate." But as Defendants point out, Individual Plaintiffs are not "forced" to vaccinate. Rather, under the Policy, vaccination is a condition of physical presence at the University. All students, including Individual Plaintiffs, have a choice – albeit undoubtedly a difficult one – to get vaccinated, seek an exemption (if applicable), or transfer elsewhere.

It is well established that "[a] delay in collegiate or graduate education isn't typically irreparable harm." Klaassen v. Trustees of Indiana Univ., 2021 WL 3073926, at *41 (N.D. Ind. July 18, 2021). Indeed, courts have repeatedly held that delays in education are compensable by monetary damages. See, e.g., Doe v. Princeton Univ., 2020 WL 2097991, at *7 (D.N.J. May 1, 2020) (a delay in plaintiff's education, analogous to a suspension, can be remedied through monetary compensation); Madej v. Yale Univ., 2020 WL 1614230, at *6–7 (D. Conn. Mar. 31, 2020) (academic withdrawal does not mean plaintiff will never be able to obtain his degree; rather, his ability to do so will be delayed, which can be remedied through monetary compensation; reputational harm assertions are "too speculative to warrant injunctive relief"); Roden v. Floyd, 2018 WL 6816162, at *5 (E.D. Mich. Nov. 13, 2018), report and recommendation adopted, 2018 WL 6815620 (E.D. Mich. Dec. 27, 2018) (delays in education do not constitute irreparable harm); Phillips v. Marsh, 687 F. 2d 620 (2d Cir. 1982) ("We can conceive of no irreparable harm that would accrue to [the plaintiff] in allowing her graduation to await the outcome of the trial on the merits; any damages to her from deferring her career as a military officer in that period of time would surely be compensable by monetary damages."). Plaintiffs make no showing as to why this case would warrant a different conclusion. The Court finds that Plaintiffs fail to meet their burden to show irreparable harm.

### C. Balance of Equities and Public Interest

Finally, the Court finds that the balance of equities and the public interest weighs heavily against the requested relief. Plaintiffs Choi and Powell assert an individual liberty interest in refusing unwanted treatment. (See Appl.) While that is certainly an important liberty interest, "[v]accines address a collective enemy, not just an individual one." Klaassen, 2021 WL 3073926, at *24. Thus, Plaintiffs' decision to refuse vaccination does not affect them alone. The UC community includes more than 280,000 students, and more than 227,000 faculty and staff, who are expected to return to its campuses this fall. (Boden-Albala Decl. ¶ 8.) This community includes individuals who may be at higher risk of contracting COVID-19 and/or suffering poor prognostics outcomes for said infection. (Id. ¶ 7.) High vaccine coverage in the community protects the community at large, including those who are particularly vulnerable and those who cannot be vaccinated. (Id.; see also Huang Decl. ¶¶ 6-9; Lo Decl. ¶¶ 6-10.) Facing a sharp surge in COVID-19 cases and the highly contagious Delta variant (Kuwahara Decl., Exs. 3-6), the Policy seeks to "maintain the health and well-being of the campus community and that of the general public" by limiting physical access to the University community to those who are vaccinated (or eligible for limited exemptions). (Kuwahara Decl., Ex. 1.) These public concerns

weigh more heavily than Individual Plaintiffs' interest in refusing unwanted treatment, particularly where they have other options, as discussed above.

Plaintiffs assert that Defendants are "in no way harmed by the issuance of an injunction that prevents the state from enforcing unconstitutional restrictions." Legends Night Club v. Miller, 637 F.3d 291, 302-03 (4th Cir. 2011). (Appl. at 21.) But Plaintiffs fail to show that they are likely to succeed on the merits of their constitutional claims. Similarly, other than a few references to "State sponsored propaganda," Plaintiffs fail to address the public interest in the health and safety of the larger community. As several other courts have held, Plaintiffs have failed to establish that the balance of harms or the public's interest favors the extraordinary remedy of a temporary restraining order. Klaassen, 2021 WL 3073926, at *45-46; Carmichael v. Ige, 470 F. Supp. 3d 1133 (D. Haw. 2020).

## V.    CONCLUSION

For the reasons above, the Court DENIES Plaintiffs' Application.

**IT IS SO ORDERED.**